## RUGGLES VS. MARSILLIOTT.

By the act of Congress of August 3d, 1843, allotting certain lands to the Stockbridge Indians, as soon as the report of the commissioners therein provided for, showing the allotment, had been transmitted to the President of the United States, and before the issue of any patent by the President, the title to the several lots became vested in the allottees, respectively, as grantees under the act, in fee simple; and the act of August 6, 1846, repealing the act of 1843, could not divest the title thus acquired; and even if it did, such title was restored and confirmed by the subsequent treaties with said Indians (in 1848 and 1856) to all the allottees who had accepted the lands allotted to them, *and to their assigns.*

Land allotted to J. T., a member of said tribe, by the commissiondrs under said act of 1843, was by him, on the 10th of November, 1848, conveyed by warranty deed to J. B. In a treaty between the United States and said tribe, entered into on the 24th of the same month, the name of said J. T. appears on the roll or census of those who renounce all benefit of said act of 1843. In ejectment by one who claimed said land under a deed from the Fox and Wisconsin River Improvement Co., against one who claimed under J. B., *Held,* that the title of J. B. was valid, and the state could not acquire title to said land under the act of Congress of August 8, 1846, and subsequent acts granting it lands for the improvement of said rivers.

DOWNER, J., thought that under the act of Congress of August 8, 1846 (by which the United States granted to the state of Wisconsin "a quantity of land equal to one half of three sections in width on each side of the Fox river and the lakes through which it passes"), and the act of August 3, 1854 (which authorized the governor of this state to select the balance of the lands to which the state was entitled under the act of 1846, out of any of the unsold public lands subject to private entry at $1.25 per acre, and not subject to pre-emption), the state could not acquire title to *any* of the lands included in what is known as the "Stockbridge Reservation."

APPEAL fram to the Circuit Court for *Calumet* County.

Ejectment. Trial by the court without a jury. Judgment for the plaintiff; from which the defendant appealed.

The case is stated in the opinion.

*Finches, Lynde & Miller,* for appellant:

1. The appellant's title is perfect.   The act of Congress of 1843 expressly authorized the lands of the Stockbridge Reservation to be partitioned and divided among the individual members of the tribe.   Such partition and division was actually made in exact accordance with the act.   The government, by the preamble to the treaty of November 24th, 1848, recognized such partition and division as creating vested private rights; and by the fourth article of the treaty actually confirmed such allotment.   Thompson, the original grantee, accepted of the allotment, and on the 10th of November, 1848, only fourteen days before the treaty was executed, and more than five years after the allotment was made, conveyed the land by a full covenant warranty deed.   *Berthold v. McDonald,* 22 How. (U. S.), 334; *Strother v. Lucas,* 12 Peters, 458; *Chouteau v. Eckhart,* 2 How., 344; *Le Bois v. Bramell,* 4 id., 449; *Landes v. Brant,* 10 id., 370; *Grignon's Lessee v. Astor,* 2 id., 319: *Stoddard v. Chambers,* id., 284; *Marsh v. Brooks,* 8 id., 223; *U. S. v. Brooks,* 10 id., 442; *Van Rensselaer v. Kearney,* 11 id., 325; *Lessee of French v. Spencer,* 21 id., 228; *Doe v. Wilson,* 23 id., 457; *Rutherford v. Greene's Heirs,* 2 Wheat., 196; 2 Yerger, 407; 3 Hawks (N. C.), 155; *Challefoux v. Ducharme,* 8 Wis., 287.   2. Counsel further argued that, independently of the question of defendant's title, the plaintiff had shown no valid title to the land, on the ground that the state and the Fox and Wisconsin Improvement Co. could not acquire any title to any lands in the Stockbridge Reservation. U. S. Stat. at Large, vol. 7, p. 347; vol. 9, pp. 83, 955; vol. 10, p. 345; vol. 11, p. 663.

*S. U. Pinney* (with whom was *J. S. Tallmadge*), for respondent:

By the act of Congress of March 3, 1843, it was intended that the *status* of the Stockbridge Indians should be changed, and that they should be entitled "to all the rights, privileges and immunities of citizens," and that their tribal existence should cease, together with their Indian laws and customs un-

der which it had been supported, and that, after the partition therein provided for, they might, by " patents, to be issued to the several individuals named in said report, hold the said land in fee simple to themselves and their heirs and assigns." That the legal title would not pass without such a patent, has been held, substantially, by this court in *Quinney v. Denney. Before* the allottee made a conveyance of the premises in question, the act of Congress under which the allotment was made, was unconditionally repealed, August 6th, 1846 (9 U. S. Stat. at Large, 55), " and the said tribe or nation of Indians *restored to their ancient form of government,`* with all powers, rights and privileges held and exercised by them under their customs and usages, as fully and completely as though the above nam- ed acts had never been passed." In this respect the case differs from that of *Quinney v. Denney*, 18 Wis., 485. When Thompson made the conveyance in question to Brown, November 10th, 1848, he had become burdened with the condition of his tribe; and whatever right he had, he held under the laws and cus- toms of the tribe, who might cede it away, as he had no title at that time " which our courts could distinguish from that of his tribe" (Chief Justice MARSHALL. in *Johnson v. McIntosh*, 8 Wheat., 593) ; and as the tribe, by the treaty of November 24, 1848 (9 U. S. Stat. at Large, 955), chose to resume the grant made by Thompson, and make a different disposition of it by ceding it to the United States, we submit, in the language of C. J. MARSHALL, that " the courts of the United States cannot interpose for the protection of the title," and that the tribe having annulled the grant, there is " no tribunal which can re- vise and set aside the proceeding." Thompson elected, under the act of August 6, 1846, to continue to be an Indian, and declined citizenship on the terms offered. See treaty of 1848, 9 U. S. Stat. at Large, 958, where his name appears as a mem- ber of the tribe in the census taken under the second article of the treaty. While he so belonged to the tribe, he could not transfer any title, legal or equitable, to the land in question, on

account of the provisions of the 12th section of the act of June 30th, 1834, regulating trade and intercourse with the Indians, which declares, "that no purchase, grant, lease or other conveyance of lands or of any claim or title thereto, from any nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution." If the whole tribe could not make a valid grant to a citizen, upon what principle can it be maintained that a single member of it may do so? But by the treaty of 1848, Art. 3, *supra*, the land in question was ceded by the tribe to the United States. In the language of Ch. J. MARSHALL, they resumed the grant, even if valid under the laws and customs of the tribe, and, by its cession to the United States, the Indian title became extinguished. A schedule of lands patented under the 4th article of the treaty is found, 9 U. S. at Large, 960–963. Again, it is evident that the Stockbridge Indians, as a nation or tribe, never assented to the terms of the act of 1843 so as to make any title claimed under it valid. The United States did not deal or attempt to deal with individual members of the tribe, but with the tribe as an entirety. Because it was not so accepted by the tribe, the act was repealed, and the subsequent legislation was had, and the treaties of 1848 and 1856 made with the tribe, allowing the assent of some of the individuals composing the tribe to operate as an acceptance of the grant in particular cases, by electing to remain with the "Citizen" party. But Thompson elected to continue a member of the Indian party, and has ever since participated in the benefits of the subsequent treaties.

The expression found in the preamble of the treaty of 1848, that it had been "found impracticable to carry into full effect the provisions of the act of August 6, 1846, * * * without infringing upon *private rights acquired in good faith under the act of* 1843," can have no bearing on the case. It was obviously intended to apply only to transfers made under the

act of 1843, and *before* its repeal ; and the claim of title set up here was not acquired under that act, but more than two years after it had ceased to exist. The provisions of Articles 8, 13 and 14 of the treaty of 1856 (11 U. S. Stat. at Large, 663), in regard to sales made, and which in the case of *Quinney v. Denney* were held to be evidence that the allottee in that case acquired an equitable estate in the land allotted to him, refer only to sales made while the act of 1843 was in force. How could a sale be said to have been made under an act of Congress after it had been repealed ? That this is the true construction of these provisions is evident from the preamble of the treaty : " *Whereas* a part of said tribe refused to be governed by the provisions of said act [of 1843], and a subsequent act was passed on the 6th day of August, 1846, repealing the aforementioned act, but without making provision for *bona fide* purchasers of lots in the townships subdivided in conformity with the first named act." These provisions of the treaty were made to supply a defect in the repealing act of 1846, and to provide for cases that had then arisen and ought to have been provided for at that time. See letter of Huebschman, Superintendent of Indian Affairs, 11 U. S. Stat. at Large, 674. And the reservation or exception made by the President of the United States in approving the selection of the land in question by the Fox and Wisconsin Improvement Company, was made with a view of protecting any party who had in good faith acquired an interest therein before the repeal of the act of 1843. It was also no doubt intended to preserve and protect any pre-emption right on any lands that might have been selected. As to the provisions in the treaty of 1848, that the lands in the Indian district should be sold for not more than $10 nor less than $5 per acre, it is evident that it could not override the express grant of the lands to the state, made August 8th, 1846, and which became operative on the admission of Wisconsin into the Union, in May, 1848, and was accepted by the state in June, 1848, about five months be-

fore the treaty was made. *Veeder v. Guppy*, 3 Wis., 502. Att'y Gen'l BLACK, in his opinion, holds that the United States having subsequently acquired the Indian right, the title would enure to the state under the grant made to it, and therefore the treaty stipulation could only apply to such lands as would not pass by enurement, and which the United States might lawfully and consistently with its former grant sell and dispose of, as the even numbered sections. It cannot be intended or sup-posed that it was the intention of the government to defeat and nullify its own grant, conceding it had the power to do so.

In the case of *Doe v. Wilson* it was held, that when the rights of the Indian nation are extinguished, an individual of the nation who takes by treaty as private owner, may convey unless prohibited by the treaty. Pet-chi-co was in that case held to be a tenant in common, as to use and occupancy, with the United States, prior to the selection of his land, and as the rights of his nation were extinguished by the treaty, and it did not prohibit his selling the lands, an equitable title passed to his grantees. But when *Thompson* conveyed, the rights of the Stockbridge tribe had not been extinguished. As to the character and incidents of the Indian title, this case confirms the decision in *Johnson v. McIntosh*, 8 Wheat., 603. The case of *Crews v. Burcham*, 1 Black, 352, is in substance the same as *Doe v. Wilson*. But it holds that the patent is conclusive on the regularity of grant, as to whether the land was within the limits mentioned in the treaty, and that a third party could not complain if the facts were as alleged. This is a sufficient answer to the objection that the lands in question were not liable to be selected and granted in aid of the Fox and Wisconsin River Improvement Company. The United States might have objected on that ground, but the point is not open to a stranger.

In these cases the equitable title arose by an agreement on the part of the United States to grant in fee, founded on a valuable consideration. Not so in this case; when Thompson

Ruggles vs. Marsilliott.

conveyed, the United States were not under any legal or equitable obligation to grant the land to him, and in order that the doctrine of enurement of the legal title should apply, it is essential that the equitable as well as the legal title should emanate from the same source, or that the equitable title should be derived from one having a right to call for a conveyance, in some event, of the legal estate. In other words, the Indian right of use and occupancy, in the absence of any treaty stipulation, is not such an equitable title as when conveyed would draw to it, in favor of the grantee, the legal estate, when that should pass by patent from the United States, because the equitable estate (so called) did not proceed from a party who had or could have, as the law then stood (date of Thompson's deed), the right to grant, or in any contingency to call for a grant of the legal estate. It was in right of the tribe that Thompson's claim existed, and his grantee, Brown, took the conveyance from one who had no right, separate and distinct from his tribe, which could be enforced against any disposition the tribe might see fit to make of the land. His was not a right which could be recognized or protected in a court of justice, but it depended on the *political* power, from which alone the Indians could obtain title, and for that reason, if for no other, the act of Congress of August 6, 1846, is not open to any constitutional objection, and if the sovereign power wronged Thompson by passing the act, he was without remedy in a municipal court. The United States were not bound by any treaty stipulation to make him a citizen or to grant him any land in fee. It was a mere gratuity, that they proposed to do so by the act of 1843; and it was an offer the sovereign political power of the United States might withdraw whenever it chose to do so, before the transaction was consummated by a grant of the fee. *Berthold v. McDonald,* 22 How., 334 ; *Choteau v. Eckhart,* 2 id., 344; *Les Bois v. Bramell,* 4 id., 449.

By the *Court,* DOWNER, J. The title to lot forty-three in the

Stockbridge Reservation is involved in this action.    It is part
of the lands which were to be allotted according to the act of
Congress of March 3d, 1843 (5 U. S. Stat. at Large, 645), to
the Stockbridge Indians.    The first section of the act provides
that the township, containing twenty-three thousand and forty
acres, "may be partitioned and divided among the different in-
dividuals composing said tribe of Stockbridge Indians, and
may be held by them separately and severally in fee simple,
after such division shall have been made in the manner herein-
after provided." Sections two, three, four and five relate to the
board of commissioners to make the division or allotment, the
manner of making it, and the report of their proceedings.
Section six provides that three copies of the report and the map
accompanying the same should be made, one of which should
be deposited in the office of the secretary of the  territory of
Wisconsin, one in the office of the clerk of the county within
which the lands are situated,and the other should be transmitted
to the President of the United States, "who shall [should] there-
upon cause patents to be issued to the several individuals named
in said report, for the lands so apportioned to them respect-
ively, by which the said persons shall [should] be authorized to
hold the said lands in fee simple to themselves, their heirs and
assigns." The seventh section is to the effect that the report
should be filed in each of said offices, and transmitted to the
President on or before January 1, 1844, and after the same
should be so filed and transmitted, the said Stockbridge tribe
of Indians, and each and every of them, should be citizens of
the United States to all intents and purposes, with all the
rights and privileges and immunities of such citizens ; should
be subject to the laws of the United States and of said terri-
tory, the same as other citizens ; and the jurisdiction of the
United States and the said territory should be extended over
said township or reservation in the same manner as over other
parts of the territory, and their rights as a tribe or nation, and

their power of making or executing their own laws, usages or customs, should cease.

It is proved or admitted in this case, that, in pursuance of the provisions of this act, the commissioners allotted the lands, and caused reports of their proceedings to be filed, and transmitted a copy thereof to the President of the United States, within the time therein specified, and that lot forty three was allotted to Jonas Thompson, one of the Indians.

By an act of Congress approved August 6, 1846, the act of 1843 was repealed, and the Stockbridge tribe of Indians restored to their tribal government and rights; and provision was made for such as desired to become and remain citizens of the United States, to register their names within three months. After that time the township was to be divided into two parts, one known as the Indian District, the other as the Citizen District, according to the strength and number of the respective parties. The lands in the Indian District were to remain and be held in common, those in the Citizen District to be divided, and each Indian who became a citizen was to have his ratable proportion of land, for which a patent was to be issued vesting the title in fee simple in the patentee.

There is no proof that anything was ever done under this act, and the treaties of 1848 and 1856 made with these Indians furnish presumptive proof that both the Citizen party and the Indian party were dissatisfied with and embarrassed by it, and refused to carry into effect its provisions.

On the 10th day of November, 1848, Jonas Thompson, the allottee of the lot 43 under the act of 1843, conveyed the lot to John Brown by warranty deed, under whom the defendant below, apellant in this court, claims; and on the 24th day of November, fourteen days after conveying the lot, a treaty was executed between the tribe and the United States, and in the roll or census of those who compose the tribe and renounce all benefit of the act of 1843 is found the name of Jonas Thompson. This treaty, in its preamble, recites that it has

been found impracticable to carry into effect the provisions of the act of August 6, 1846, without infringing upon private rights acquired in good faith under the act of 1843, and that with a view of relieving both the Indian and the citizen parties of said tribe from their embarrassments and to secure to each their just rights, the treaty was made, by which the tribe (composed of those whose names were in the roll above mentioned) renounced the benefit of the act of 1843, and sold the township of land to the United States. The fourth article of the treaty provides " that such of said lands as were allotted by the commissioners, under the act of 1843, to members of said tribe *who have become citizens* of the United States (a schedule of which is hereunto annexed), are hereby confirmed to such individuals respectively, and patents therefor shall be issued; that the residue of said lands shall be brought into market, but shall not be sold *at less than the appraised value*, unless the Senate of the United States shall otherwise determine."

This tribe being still dissatisfied, and many of its members refusing to move to lands beyond the Mississippi, as they agreed to do by the treaty, on the 5th day of February, 1856, another treaty was made with them, by which they jointly and severally ceded to the United States all their remaining interest in the lands at the town of Stockbridge; and the thirteenth article of this treaty provides that the Secretary of the Interior might examine into the sales made by the Stockbridge Indians to whom lots of land were allotted under the act of 1843, and if they were improperly made, or without a proper consideration, they might be set aside, and patents might be issued for such lands, and to such persons as the secretary should find entitled to the same. And the fourteenth article provides that " the lots of land the equitable title to which shall be found not to have passed by valid sales from the Stockbridge Indians to purchasers, and such lots as have by the treaty of 1848 been receded to the United States, shall be sold at the mini-

mum price of ten dollars per acre " for certain descriptions, and five dollars per acre for the residue. Then follow further provisions, that purchasers of lots on which Indians had made improvements should, in addition to the minimum price, pay for the improvements, and that actual settlers and civilized persons of Indian descent should have the right of preemption.

The counsel for the appellant contends that by the act of 1843, as soon as the report of the commissioners showing the allotment of the lands had been transmitted to the President, the members of the tribe became and were citizens of the United States, and that the title to the lands allotted vested in the parties to whom they were respectively allotted, in fee simple ; that the issuing of the patents was a mere ministerial act, and was unnecessary to vest the title; that the parties took as grantees under the act of Congress without patents ; that the act of 1846, repealing the act of 1843, could not divest the title thus acquired ; and even if it did, that the title was restored and confirmed by the treaties to all the allottees who had accepted the lands allotted to them, and to their assigns ; that the spirit of the acts and the treaties taken together is to fully protect purchasers in good faith from the Indians of any lands allotted to them, and which they had conveyed before the making of the treaty of 1848; and that inasmuch as Thompson, to whom the land in question was allotted, conveyed it before the execution of the treaty, the appellant is protected. This position has been maintained with great ability, and with reasoning that is very plausible, if not sound. We are inclined to the opinion that the position is tenable. But owing to the view we have taken of the title of the plaintiff below, it is unnecessary for us to pass upon the title of the defendant. The plaintiff must recover upon the strength of his own title. He claims title under the act of Congress of August 8, 1846, by which the United States granted to the state of Wisconsin " a

quantity of land, equal to one half of three sections in width, on each side of the Fox river and the lakes through which it passes." What lands passed by this act to the state? Not one half of the lands on both sides of the Fox river equal in width to three sections; for a large part of such lands had been previously sold by the United States, and probably thousands of acres of them were sold after the passage of the act before the governor of the state selected the lands pursuant to its provisions. It may be that the state, under that act, became seized of such of the lands selected by the governor as the United States had not, before the passage of the act, nor after its passage and before the selection, disposed of or appropriated to their own use, but of none other. The Stockbridge Reservation the United States, by the act of 1843, had given in fee simple to the Stockbridge Indians. Congress repealed that act, but in the repealing act provision is made for the disposition of these lands, otherwise than giving them to the state. If the repealing act was valid in all respects, of which we have some doubt, the United States never asserted their rights under it, but subsequently ratified the allotments and sales under the act of 1843 as to a part of the lands, and acquired a title to the remainder by purchase of the tribe and of individuals. The act of 1843 is based upon the idea that the Stockbridge Indians would drop the customs of savages, and assume those of civilized men, and make these lands their permanent home or residence. The repealing act also, as it appears to us, contemplates a permanent occupation of these lands by these Indians. The lands were to be divided between the citizen and tribal parties; those who elected to become and remain citizens were to have their lands conveyed to them individually in fee simple; such as preferred the tribal government were to hold their lands in common, the legal title remaining in the United States for the use of the tribe. The latter held their lands by a tenure somewhat different from that by which other tribes occupied the public lands of the United

States. *Wilcox v. Jackson*, 13 Pet., 498. The Stockbridges held, occupied or owned these lands under and by virtue of a treaty made with them before the act of 1843, and under the acts of Congress, which gave them such rights and title as preclude the idea that Congress, by an act approved two days after the last act under which they held the lands, should grant them to the state, and thus authorize the state, or those claim-ing under it, to drive the Indians from the very lands secured to them by the acts of Congress of 1843 and of the 6th of August, 1846. The treaty of 1848, providing that a part of these lands should be brought into market at their *appraised value*, and that of 1856, providing that they should be sold at not less than *five dollars* per acre, are inconsistent with the idea that the lands had previously been granted to the state

The act of Congress of August 3, 1854, authorized the governor of the state of Wisconsin to select the balance of the lands to which the state was entitled under the provisions of the act of 8th August, 1846, out of any of the unsold pub-lic lands subject to private entry at $1.25 per acre, and not subject to preemption. The land in question could not be selected under this act, for it was not subject to entry at the price therein specified.

The counsel for the respondent insists that the exceptions to the finding of the circuit court are not such as to enable the court to review the evidence. It is immaterial whether they are or not. The facts found do not show title to the land in the plaintiff, or warrant the conclusion of law of the circuit court, that the plaintiff below owned the land in fee simple. All the material facts proved are in the finding, and no excep-tions were necessary.

We come to the conclusion that the title to the lands did not vest in the state under and by virtue of either of the acts of Congress, and consequently the plaintiff below had no title.

The judgment of the circuit court is reversed, with costs, and a *venire de novo* awarded.

A motion for a rehearing was made in this cause, which was disposed of at the June Term, 1865, as follows:

*By the Court*, DOWNER, J.   On a motion for a rehearing, the majority of the court are of opinion that the case is rightly decided on the first point in the opinion, and overrule the motion.